UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MYA SARAY, LLC,                      )
                                     )
     Plaintiff,                      )
                                     )
          v.                         )  Civil Action No. 1:10-cv-789
                                     )
AL-AMIR, INC. & ALI HAMMOUD,         )
                                     )
     Defendants.                     )

REPORT AND RECOMMENDATION

This matter came before the undersigned on plaintiff's Motion for
Sanctions.  (Doc. 112.)  The plaintiff's Motion outlines only a
fraction of the defendants' history of casual disregard for the
judicial process and for this Court.  On May 27, 2011, after defendant
corporation Al-Amir, Inc. failed to appear through counsel in
violation of the Court's April 21, 2011 order to obtain Virginia
counsel (Doc. 118), and after argument by pro se defendant Ali
Hammoud, the undersigned took the plaintiff's Motion under advisement
to issue this Report and Recommendation.

I. INTRODUCTION

Plaintiff Mya Saray, LLC ("Mya Saray") is a manufacturer and
distributor of tobacco products and accessories, including a Middle
Eastern-style pipe known as a hookah.  (Pl's. Am. Compl., Doc. 99 at ¶
5.)  On July 15, 2010, Mya Saray filed suit against Defendants Ali
Hammoud ("Mr. Hammoud") and Al-Amir, Inc. ("Al-Amir"), asserting that
the defendants had violated the terms of a November 14, 2008

1

settlement agreement, infringed Mya Saray's patents and trademarks, and violated certain unfair competition and consumer protection laws. (Doc. 99 at ¶¶ 5-58.)

### A.  Jurisdiction and Venue

Mya Saray is a limited liability company organized and existing under Virginia law.  (Doc. 99 at ¶ 1.)  Al-Amir is a corporation organized and existing under the laws of the state of Michigan, with its principal place of business in Dearborn, Michigan.  (Doc. 99 at ¶ 2.)  Mr. Hammoud is a natural person, a citizen of Michigan, residing in Dearborn Heights, Michigan.  (Doc. 99 at ¶ 3.)

This Court has subject matter jurisdiction over this case and supplemental jurisdiction over the plaintiff's Virginia state law claims because Mya Saray's patent, trademark, and unfair competition claims arise under federal law, and because the state and federal claims share a substantial and related claim, that is, whether the defendants used pipe designs and products similar to those sold by Mya Saray.  See 28 U.S.C. §§ 1331, 1338(b).

This Court also has personal jurisdiction over this case because Virginia's long-arm statute authorizes the exercise of jurisdiction, and the defendants satisfy the "minimum contacts" test under the Due Process Clause of the Fourteenth Amendment.  See CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d 285, 292 (4th Cir. 2009).  Moreover, the defendants waived their objections to personal jurisdiction and venue in any action arising out of the parties' prior settlement agreement.  (Doc. 99-1 at ¶ 7.2.)

Venue is proper because the defendants waived their objections to venue in any action arising out of the parties' prior settlement agreement.  (Doc. 99-1 at ¶ 7.2.)  Mya Saray's breach of contract cause of action clearly arises out of the prior settlement agreement and the related claims.  (Compl. at ¶¶ 10-20).  The undersigned finds that the breach of contract action and other claims are sufficiently related that the defendants' waiver in the settlement agreement waived objections to venue for all of Plaintiff's related causes of action.

### B.   Process and Service

Mya Saray filed its initial Complaint on July 15, 2010.  (Doc. 1.)  Summons was issued, but on September 8, 2010 Mya Saray's counsel requested and received a new summons because the original summons was lost, destroyed, or otherwise unavailable.  (Docs. 4 & 5.)

Emily Claphan, a process server, had attempted to serve Mr. Hammoud at his home on Kingswood Drive in Dearborn Heights, Michigan.  (Doc. 6.)  She was unable, however, to find an adult at that address who would admit any knowledge of Mr. Hammoud, and all persons contacted at that address denied that Mr. Hammoud was still living there.[1]  (Doc. 6.)  The other process server, Jeffrey Claphan, indicated in his affidavit that Mr. Hammoud and adult persons who identified themselves as Mr. Hammoud's relatives refused to come to the door of the home or admit that they knew about Mr. Hammoud.  (Doc. 7.)

---

[1] Mr. Hammoud has, since that time, filed court documents listing the Kingswood Drive address as his own.  (Docs. 120, 121, 122, 131.)

On August 13, 2010, at 11:50 A.M., Jeffrey Claphan attempted to serve Al-Amir, Inc. at a Dearborn, Michigan address on West Warren Street.  (Doc. 7.)  Mr. Claphan asked for Mr. Hammoud, and when he asked whether the man to whom he was speaking was Ali Hammoud, the man told Mr. Claphan to come back to the store on the following Wednesday.  (Doc. 7.)  Mr. Claphan stated in his affidavit that the man who told him to come back the next week was, in fact, Mr. Hammoud.[2]  (Doc. 7.)

On August 18, 2010, Mr. Claphan returned to the address on West Warren Street, and observed that the name on the storefront, which had previously stated "Al-Amir Gifts Shop & Kitchenware," had been changed to leave only signage stating "-Amir Alfakher Distributor."  (Doc. 40-1.)  Inside the store, Mr. Claphan attempted to serve the Summons and Complaint to a man who identified himself as "Jafar," and who claimed to be the new owner of the store, having acquired the store from Ali Hammoud on August 16, 2010.  (Doc. 40-1.)  "Ali Jafar" stated that Ali Hammoud was no longer available or affiliated with the store, and that the new business was called "Amir."  (Doc. 40-1.)  Later court filings indicate that these were patent falsehoods, and that Ali Hammoud still retains some affiliation with Al-Amir, if not outright control.  (Docs. 120, 121, 122, 131.)  Mr. Claphan did not serve the Summons and Complaint at that time.  (Doc. 40-1.)

On August 23, 2010, after verifying the address for Al-Amir, Inc. with Michigan's Department of Energy Labor and Economic Growth, Emily Claphan and Jeffrey Claphan returned to the West Warren Street

---

[2] A photo of the man also appears in Jeffrey Claphan's declaration (Doc. 40-1) attached to Mya Saray's opposition to the Defendants' motion to set aside default.

4

storefront.  (Doc. 6.)  At 6:02 P.M., they entered the store and
handed the papers to "Jafar."  (Doc. 6, Doc. 7.)  "Jafar" told them
that he "didn't give a shit about the law."  (Doc. 40-1.)  He threw
the papers back at Emily Claphan, followed the process servers out of
the store yelling that he would not accept process, and ultimately
threw the process into the street. (Doc. 6, Doc. 7, Doc. 40-1.)

In October, 2010, Mya Saray's attorney, Ms. Susan Simpson, served
the defendants Al-Amir and Mr. Hammoud under Va. Code. §§ 8.01-328.1,
8.01-329, which allows substituted service on nonresidents through the
Virginia Secretary of the Commonwealth.  (Docs. 8 & 9.)  The
certificates filed in this case indicate that the Secretary mailed
process to the defendants on October 8, 2010.  (Docs. 8 & 9.)

The undersigned finds that the defendants were properly served
under Fed. R. Civ. P. 4.  Mya Saray was obliged to provide the
defendants with "notice reasonably calculated, under all the
circumstances, to apprise interested parties of the pendency of the
action and afford them an opportunity to present their objections."
Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).
Fed. R. Civ. P. 4(e)(2) states that service may be made by delivering
a copy of the summons to an individual personally or by leaving it at
the individual's dwelling with someone of suitable age and discretion.
Here, Mr. Claphan tried repeatedly and unsuccessfully to leave process
at the address where Mr. Hammoud receives mail.  Mr. Claphan's one
opportunity to speak with Mr. Hammoud face-to-face was unsuccessful
only because Mr. Hammoud deceived Mr. Claphan into returning at a time
when Mr. Hammoud would not be present.  Likewise, when Mr. Claphan and

Ms. Claphan attempted to serve process on the defendants at the storefront of Al-Amir, Inc., they were met with evasion, subterfuge, and aggression.

Valid service can occur even when a defendant refuses or evades service.  See Ali v. Mid-Atlantic Settlement Svcs., Inc., 233 F.R.D. 32, 36-38 (D.D.C. 2006).  The undersigned finds that the defendants were sufficiently apprised of this action's pendency on August 23, 2010, when "Jafar" refused to accept service of process, notwithstanding the defendants' attempts at subterfuge and rejection of service.  The undersigned also finds that, at the very latest, the defendants were sufficiently apprised of the action's pendency on October 8, 2010, when Mya Saray served the defendants through substituted service.

## II. GROUNDS FOR ENTRY OF DEFAULT

The issue before the undersigned is whether sanctions should be imposed on defendants Mr. Hammoud and Al-Amir, and if so, what sanctions are appropriate.  The undersigned finds that default is appropriate as to both Mr. Hammoud and Al-Amir, Inc.

### A. Legal Standard

Sanctions against a litigant for discovery and other misconduct are within the court's discretion.  Mut. Fed. Sav. & Loan Ass'n v. Richards & Assoc., Inc., 872 F.2d 88, 92 (4th Cir. 1989)(citing Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 642 (1976)). There are many ways to impose sanctions, but the sanction of default is different from other sanctions because it stands in tension with the party's right to trial by jury and fair day in court.  Richards,

872 F.2d at 92 (citing <u>Wilson v. Volkswagen of Amer., Inc.</u>, 561 F.2d 494, 503-04 (4th Cir. 1977)).  Sanctions do not deprive the litigant of the right to trial by jury and a fair day in court, however, when the litigant has demonstrated a clear intention not to participate in the litigation.  Accordingly, the Fourth Circuit applies a four-part test to determine whether default is an appropriate sanction for discovery misconduct: (1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions.  <u>Id.</u>

In <u>Richards</u>, the defendants filed a series of untimely and inadequate discovery responses which were the subject of multiple motions to compel.  <u>Id.</u> at 89-90.  The magistrate recommended default, and the district court entered default, incorporating by reference the magistrate's Report and Recommendation.  <u>Id.</u> at 91-92.  On appeal, the Fourth Circuit affirmed, holding that the defendants' conduct represented bad faith and callous disregard, both for the authority of the district court and for the Rules.  <u>Id.</u> at 92.  Noncompliance with orders and the Rules, the court observed, not only jeopardizes the adversary's case, but also encourages other litigants to "flirt with misconduct."  <u>Id.</u>  The court therefore considered sanctions to be an appropriate and particularly effective method to send an "unmistakable message to them and others that the judicial system will not tolerate repeated misconduct never wholly remedied in the future."  <u>Id.</u> at 94.

"To find otherwise," the Fourth Circuit wrote, "would be to send the opposite message that the court may be pushed, ignored and defied to the outermost limits so long as the noncomplying party has even an inadequate fallback act ready in the wings should the final curtain be falling." Id.

### B. Procedural history

Over the course of this litigation, the defendants have been extended every opportunity to cure deficiencies in their conduct of discovery, defaults, and other missteps in the litigation of this case.  They have nonetheless failed to honor their fundamental obligation to the institution of the Court.

The Complaint was filed on July 15, 2010.  (Doc. 1.)  Pursuant to Federal Rule of Civil Procedure 12, the defendants had twenty (21) days after service of process to serve their Answers.  Fed. R. Civ. P. 12.  The defendants' Answers were therefore due on either September 14, 2010, or at the latest, on October 29, 2010.

Neither defendant filed an answer by that date.  On November 3, 2010, Mya Saray requested the Clerk to enter default against defendants Al-Amir and Mr. Hammoud.  (Docs. 11 & 13.)  The Clerk entered default on November 8, 2010.  (Doc. 14.)  On November 12, 2010, District Judge Anthony J. Trenga ordered Mya Saray to promptly file a motion for default judgment.  (Doc. 18.)  Mya Saray filed its Motion for Default Judgment as to defendants Al-Amir and Mr. Hammoud the same day.  (Doc. 22.)

On November 27, 2010, attorney Stephen Swift entered an appearance on behalf of Al-Amir and Mr. Hammoud, and filed a Motion to

Continue.  (Docs. 28 & 29.)  On November 29, 2010, attorney Nabih Ayad filed an application for appearance pro hac vice on behalf of the defendants, which was granted.  (Doc. 30.)  On November 30, 2010, attorney Stephen Swift filed an Answer on behalf of Al-Amir and Mr. Hammoud.  (Doc. 34.)

On December 3, 2010, Al-Amir and Mr. Hammoud moved to set aside the Clerk's default on the grounds of res judicata, failure to personally serve Al-Amir through "Jafar," failure to serve Mr. Hammoud through "Jafar," and improper substituted service through the Secretary of the Commonwealth because the defendants lacked personal contacts with the State of Virginia.  (Doc. 35.)  The Court set aside the clerk's default in the interests of justice without ruling on the grounds put forward in the defendants' motion, but awarded fees and costs to Mya Saray.  (Doc. 46.)

On February 18, 2011, Mya Saray filed its First Motion to Compel (Doc. 58) because the defendants had failed to respond to discovery as required.  The defendants filed an opposition (Doc. 67) that advanced several unusual and unpersuasive arguments.  Consequently, on March 4, 2011, the Court issued a Memorandum Opinion granting Mya Saray's motion to compel, deemed the defendants' objections to discovery as waived, and ordered the defendants to serve full and complete discovery responses by 5:00 P.M. on March 11, 2011.  (Doc. 78.)  The Court warned the defendants that "[f]ailure to comply with this order may result in sanctions pursuant to Fed. R. Civ. P. 37(a)(5)[.]" (Doc. 78.)

On March 15, 2011, counsel for Mr. Hammoud and Al-Amir filed an emergency motion to withdraw.  (Doc. 86).  According to counsel, Mr. Hammoud had unequivocally discharged his Virginia and Michigan counsel on March 14, 2011, effective immediately, demanding that both firms cease all work immediately.  (Doc. 86.)  Alternative Virginia counsel filed a notice of appearance on March 21, 2011.  (Doc. 93.)  New counsel moved to withdraw only 7 days later, however, on March 28, 2011, citing irreconcilable differences with the defendants.  (Doc. 103.)  The Court granted the latter motion to withdraw, but did not alter the case schedule.  (Doc. 105.)  Al-Amir, Inc. was then without counsel.

On March 25, 2011, Mya Saray filed its Second Motion to Compel (Doc. 100), alleging that the defendants' responses to interrogatories and requests for production were inadequate.  The defendants filed no opposition.  On April 1, 2011, the Court granted Mya Saray's second motion to compel, ordering the defendants to provide full and complete discovery responses by Friday, April 8, 2011.  (Doc. 105.)  The Court also granted Mya Saray costs and fees, and ordered Al-Amir, Inc. to retain Virginia counsel by April 8, 2011.  The Court warned the defendants that "failure to comply with the Order may result in sanctions under Federal Rule of Civil Procedure 37."  (Doc. 105.)  Despite the order, by April 8, 2011, no attorney for Al-Amir had entered an appearance.

On April 15, 2011, Mya Saray filed a motion for sanctions (Doc. 112), alleging that Al-Amir had failed to obtain counsel for

representation in violation of the Court's order, that neither
defendant had supplied further documents or answers pursuant to the
Court's April 1, 2011 order, and that Al-Amir had suppressed evidence
of witnesses and product storage locations.  As part of its
submission, Mya Saray filed a declaration by George Ismair, a former
sales manager for Al-Amir, Inc., who proffered personal knowledge of
Al-Amir's allegedly infringing activities.  (Doc. 112-3.)  The
defendants had not disclosed George Ismair, either in their initial
disclosures or in response to discovery, despite his significant
knowledge of Al-Amir's internal operations.

On April 20, 2011, through Michigan attorney Mr. Sam M. Fakih of
Fakih & Associates, Al-Amir and Mr. Hammoud filed their motion to
extend the deadlines for obtaining Virginia counsel.  (Doc. 117.)
District Judge Anthony J. Trenga granted the defendants' motion in
part and referred the remainder to the undersigned, who extended the
deadline for the defendants to obtain Virginia counsel to May 2, 2011.
(Doc. 118.)

On May 3, 2011, however, Mr. Fakih disavowed any status as
counsel for the defendants in this Court, submitting a letter to the
Clerk stating that he had never entered an appearance, and that Mr.
Hammoud intended to represent himself before this Court.  (Doc. 119.)
Mr. Fakih also stated that he had explained to Mr. Hammoud, and that
Mr. Hammoud understood, that a corporation cannot proceed pro se.
(Doc. 119.)  Al-Amir was therefore without counsel in violation of the

Court's order and against advice of counsel, even after the Court's second deadline.

Next, in a willful violation of the Court's order to obtain counsel for Al-Amir, Mr. Hammoud attempted to file several pleadings on behalf of himself and Al-Amir, including an Answer to the First Amended Complaint (Doc. 120), a Response to Motion for Protective Order (Doc. 121), and a Response to Motion for Sanctions (Doc. 122).

On May 27, 2011, the Court heard argument on Mya Saray's Motion for Sanctions. (Doc. 124.) Mr. Hammoud appeared pro se, and again, no counsel appeared for Al-Amir. Instead, Mr. Hammoud attempted to represent Al-Amir before the Court. The Court therefore struck the purported Answer of Al-Amir, which had been filed by Mr. Hammoud (Doc. 120), and took this matter under advisement. (Docs. 124, 125.)

## C. The appropriateness of sanctions

The undersigned concludes that entry of default against the defendants is an appropriate sanction. As noted above, the Richards factors are: (1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions. Richards, 872 F.2d at 92.

## 1. Bad faith

The undersigned finds that the defendants have clearly demonstrated bad faith.  As noted above, the Court twice ordered the defendants to provide Mya Saray with complete discovery responses by specific deadlines.  Notwithstanding the Court's direct order, Al-Amir missed both deadlines, either filing late or failing to provide anything resembling an adequate response.

Likewise, Al-Amir was under a direct order from the Court to obtain counsel by April 8, 2011, and then later, May 2, 2011.  Al-Amir nonetheless failed to meet both deadlines.  Even after being informed of this fact by the Court and by his retained counsel in Michigan, Mr. Hammoud flagrantly ignored the order by attempting to file an Answer and other pleadings and appear before the Court on behalf of Al-Amir.

Moreover, at argument on Mya Saray's Motion for Protective Order (Doc. 106), it became clear to the undersigned that Mr. Hammoud was dealing disingenuously with counsel for Mya Saray.  Mr. Hammoud had filed an improper opposition for himself and Al-Amir (Doc. 121) in response to Mya Saray's Motion for Protective Order, in which he argued that the Court should order the parties to enter into a Stipulated Mutual Protective Order.  The defendants, however, had refused to engage in discussions regarding a stipulated protective order.  In short, Mr. Hammoud was attempting to use the Court to sandbag Mya Saray.  The undersigned finds that the defendants have consistently participated in this litigation with bad faith, and that such bad faith cannot be remedied by any lesser sanction than default.

**2. Material prejudice resulting from violations**

The undersigned likewise finds that the defendants' stonewalling and noncompliance outlined in the pages above have significantly prejudiced Mya Saray by denying it discovery of material evidence to which it is entitled under the Federal Rules of Civil Procedure and this Court's orders.  Mya Saray asked for evidence regarding sales volume and pricing, information that would prove the extent of its damages, but Al-Amir responded with minimalist answers apparently designed to prevent Mya Saray from making any calculations whatsoever.  At argument before the undersigned, it remained uncontradicted that although some documents had been provided since the last pleadings were filed, these documents were far from complete answers to the discovery requests.  Therefore the undersigned finds that the defendants were in continuing violation of the Court's multiple orders to provide complete discovery responses.

The defendants furthermore failed to identify as a potential witness one of Al-Amir's former sales agents, George Ismair, who had extensive knowledge of Al-Amir business activities during the time periods relevant to the complaint.  Al-Amir pointedly failed to disclose the existence of a warehouse containing Al-Amir inventory. When counsel for Mya Saray inspected the premises, they were told that any products related to the suit had been discarded.  It is clear to the undersigned that the defendants' conduct, which seems to be a toxic mix of bad faith and indifference, has deprived Mya Saray of its opportunity to obtain material, discoverable evidence necessary to its claim for damages.

**3. The need for deterrence**

The defendants' noncompliance must be deterred because it presents a consistent pattern of indifference and disrespect for the authority of this Court.  The defendants' conduct here is particularly egregious because it takes place after a series of prior sanctions. As such, the infraction amounts to more than mere noncompliance with the Rules, which could perhaps be remedied by a lesser sanction. Entry of default suits the particular sort of noncompliance at issue here because the defendants have simply refused to obey the Court's orders, and indicate no intention to comply further.  Drastic measures are necessary.  The undersigned finds that the defendants' consistent disregard for the Court's basic function merits deterrence.

**4. Effectiveness of less drastic sanctions**

It appears to the undersigned that no sanction short of default can accomplish deterrence in this case.  The defendants' early attempts to dodge service of process, though ultimately unavailing, were mere indicia of the calculated recalcitrance that must now be addressed in this Report and Recommendation.  Al-Amir has consistently demonstrated that it has no intention of abiding by the Federal Rules of Civil Procedure, this Court's orders, or even advice from counsel. The Court had previously ordered that the defendants pay attorney's fees and costs related to Mya Saray's motions to compel (Docs. 78 & 105), but those remedies have not resolved the problem.  The undersigned therefore finds that the only remedy that will prevent the

defendants from engaging in additional nonsense is the entry of default.

## II. FINDINGS OF FACT

A defendant in default admits the factual allegations in the complaint. Fed. R. Civ. P. 8(b)(6) ("An allegation--other than one relating to the amount of damages--is admitted if a responsive pleading is required and the allegation is not denied."); see also GlobalSantaFe Corp. v. Globalsantafe.com, 250 F.Supp.2d 610, 612 n.3 (E.D. Va. 2003) ("Upon default, facts alleged in the complaint are deemed admitted and the appropriate inquiry is whether the facts alleged state a claim.").[3]  Having reviewed the pleadings, the undersigned finds the following facts.

Plaintiff Mya Saray manufactures and distributes tobacco products, including hookahs and hookah accessories. (Compl. at ¶ 5.) Mya Saray sells tobacco products nationally under several U.S.-registered trademarks, including MYA, Reg. No. 3,031,439, MYA, Reg. No. 3,031,440, and is the exclusive owner of U.S. Patent No. 7,404,405 ("'405 patent"). (Compl. at ¶ 5-6.)  Mya Saray sells a particular hookah, the Mya QT ("QT"), which incorporates Mya Saray trademark features into its design. (Compl. at ¶ 7.)  The QT hookah is composed of a distinctive hookah stem design and a distinctive hookah base, each separately trademarked and capable of independently acting as an indicator of source. (Compl. at ¶ 7.)  The trade and relevant consumers associate and identify the name QT, the design of the QT in

---

[3]On March 25, 2011, the Plaintiff filed an Amended Complaint (Doc. 99).

its totality, the design of the QT stem, and the design of the QT base with Mya Saray.  (Compl. at ¶ 7.)  The product configuration of the QT is protected by federally registered trademark Reg. No. 3,845,276. (Compl. at ¶ 7.)

On or about June 2005, Al-Amir began to purchase tobacco products in substantial quality from Mya Saray, including hookahs and hookah accessories, for regional distribution throughout the state of Michigan and end-user sales via its retail store.  (Compl. at ¶ 8.) Unacceptable trade practices on the part of Al-Amir caused Mya Saray to refuse to continue to distribute tobacco products to Al-Amir on or about September 2007.  (Compl. at ¶ 8.)  Defendant Mr. Hammoud owns, manages, and controls Al-Amir, and agreed to be personally liable for Al-Amir's contractual obligations under the Settlement Agreement. (Compl. at ¶ 28; Docs. 120, 121, 122, 131.)

On May 14, 2008 Mya Saray sued Al-Amir in the United States District Court for the Eastern District of Virginia for trademark infringement and unfair competition over various trademarks ("First Trademark Infringement Suit"), in Case No. 1:08-cv479.  (Compl. at ¶ 9.)  These claims were based, in part, on Al-Amir's infringement of the Mya QT hookah.  Al-Amir allegedly distributed, caused the manufacture of, advertised, publicized, sold, and offered to sell the "Maganda" hookah, which is a close copy of the Mya QT hookah.  (Compl. at ¶ 9.)

On November 20, 2008 Mya Saray and Al-Amir settled the First Trademark Infringement Suit by Agreement ("Settlement Agreement").

17

(Compl. at ¶ 10.)  In the Settlement Agreement, Mya Saray agreed to, and did, dismiss the Trademark Infringement Suit with prejudice. (Compl. at ¶ 11.)  In the Settlement Agreement, Al-Amir agreed to refrain from "distributing, selling, marketing, advertising, importing, vending, or purchasing [copies of the QT hookah or copies of the QT] hookah components individually such as hookah bottles/bases and hookah stems."  (Compl. at ¶ 12.)  Al-Amir also agreed to appropriately mark its "Jamila" hookahs by the Jamila trademark or by the manufacturing source, Kassir Co., agreed to cease permanently all use of specified Mya Saray trademarks terms or any terms misleadingly or deceptively similar thereto, and agreed to cease permanently all use of specified Mya Saray packaging ("Prohibited Packaging") (Compl. at ¶¶ 14, 16, 18.)

Mya Saray distributes, advertises, publicizes, sells, and offers to sell products within a carrying container (the "Mya Closed Top Carrying Cage"), depicted in Exhibit I, which includes distinctive, non-functional, design elements protectable and protected by trademark. (Compl. at ¶ 21.)  The Mya Closed Top Cage is characterized by its distinctive attributes, which include: size, arrangement of sidewall bars, and arrangement of ceiling and floor bars.  (Compl. at ¶ 21.)  The overall presentation of the Mya Closed Top Cage serves as a trademark.  (Compl. at ¶ 21.)

Al-Amir did, and does now, without permission distribute, cause the manufacture of, advertise, publicize, sell, and offer to sell to merchants and consumers hookah products not originating from Mya Saray

in a carrying container confusingly similar to the Mya Closed Top
Carrying Cage.  (Compl. at ¶ 22.)  Al-Amir did, and does now, without
permission distribute, cause the manufacture of, advertise, publicize,
sell, and offer to sell to merchants and consumers hookah products not
originating from Mya Saray that are confusingly similar to the Mya
Saray QT Hookah, as well as the QT Stem and QT Base.  (Compl. at ¶
22.)  The Al-Amir Andile ("Andile") hookah is an almost exact copy of
the QT hookah, and the primary difference between the Andile and QT
hookahs is the inferior quality of the materials and construction
methods used for the Andile.  (Compl. at ¶ 22.)

Al-Amir did, and does now, without permission distribute, cause
the manufacture of, advertise, publicize, sell, and offer to sell to
merchants and consumers hookah products not originating from Al-Amir
that are confusingly similar to the hookahs of others, including the
Al-Amir Andile Light ("Andile Light") hookah.  (Compl. at ¶ 24.)  The
Andile Light hookah is identical in size, shape, and body
configuration as the Jamila hookah, and has been and continues now to
be sold by Al-Amir without being branded with either the Jamila or
Kassir Co. marks.  (Compl. at ¶ 24.)

Al-Amir did, and does now, without permission, distribute, cause
the manufacture of, advertise, publicize, sell, and offer to sell to
merchants and consumers hookah products not originating from Mya Saray
under the Mya Word Mark.  (Compl. at ¶ 25.)  Al-Amir did, and does
now, without permission distribute, cause the manufacture of,
advertise, publicize, sell, and offer to sell to merchants and

consumers hookah products not originating from Mya Saray under the Mya Design Mark.  (Compl. at ¶ 26.)  Al-Amir prominently displays and uses the Mya Word Mark and the Mya Design Mark in connection with hookah products not originating from Mya Saray.  (Compl. at ¶ 27.)

### III. EVALUATION OF PLAINTIFF'S COMPLAINT

Mya Saray alleges that the Defendants engaged in unfair competition violating 15 U.S.C. § 1125(a), multiple registered trademark infringements in violation of 15 U.S.C. § 1114, violations of the Virginia Consumer Protection Act, Va. Code. § 59.1-200(A), breach of contract, and patent infringement.  Evaluating the sufficiency of the Amended Complaint, the undersigned finds that Mya Saray has established all of the above causes of action.

### A.  Count I - Unfair Competition (Lanham Act)

Federal law permits a damaged party to seek civil recovery from a person who uses false or misleading designations or descriptions in connection with goods, container, or services, where the designation or description is likely to cause confusion or mistake regarding the associations and sources of goods, services or commercial activity. See 15 U.S.C. § 1125(a).

The undersigned finds that Mya Saray has established that the defendants have used and are using in commerce words, terms, names, and devices that are likely to cause confusion, mistake, or deceive as to the affiliation, connection, or association of Al-Amir with Mya Saray.  See 15 U.S.C. § 1125(a)(1)(A).  The defendants' use of those words, terms, names, and devices are likely to cause confusion as to

20

the origin, sponsorship, or approval of Al-Amir goods. See 15 U.S.C. §
1125(a)(1)(A).  Likewise, the undersigned finds that the Defendants'
use of those words, terms, names, and devices in commercial
advertising and promotion have misrepresented the nature,
characteristics, qualities, or geographic origins of Al-Amir's goods.
See 15 U.S.C. § 1125(a)(1)(B).  The Defendants have therefore violated
15 U.S.C. § 1125(a).

The undersigned also concludes that an award of attorneys' fees
and costs is appropriate under the Lanham Act.  Attorneys' fees may be
awarded to the prevailing party in exceptional cases.  15 U.S.C. §
1117(a).  The defendants' consistent disregard for this Court and
their intentional breach of the Settlement Agreement make this case
exceptional, warranting a fee award.

**B.  Counts II, III, and VII — Registered Trademark Infringement**

Federal law provides for civil liability where a person
infringes a registered trademark by using it in commerce or
reproducing it such that it is likely to cause confusion, mistake, or
deception.  See 15 U.S.C. § 1114(1).  Damages for infringement
resulting from reproduction, counterfeiting, copying, or imitation are
permitted only where they are intended to cause confusion, mistake, or
deception.  Id.  The undersigned finds that Mya Saray has established
intentional infringement of its trademarks registered as Reg. No.
3,031,439, Reg. No. 3,031,440, and Reg. No. 3,845,276, and that such
infringement has caused and will continue to cause damage to Mya

Saray.  The undersigned further finds that Mya Saray has no adequate remedy at law.

Mya Saray's amended complaint provides inadequate support, however, for the conclusion that the '439 and '440 trademarks are incontestable under 15 U.S.C. § 1065.  Mya Saray did not plead facts establishing the elements of 15 U.S.C. § 1065, and the undersigned therefore cannot conclude that these trademarks are incontestable.

The undersigned also concludes that an award of attorneys' fees and costs is appropriate under the Lanham Act.  Attorneys' fees may be awarded to the prevailing party in exceptional cases.  15 U.S.C. § 1117(a).  The defendants' consistent disregard for this Court and their intentional breach of the Settlement Agreement make this case exceptional, warranting a fee award.

## C.  Count IV — Unfair Competition (Virginia Consumer Protection Act)

Virginia's Consumer Protection Act (VCPA) prohibits certain fraudulent acts or practices committed by a supplier in connection with a consumer transaction.  Va. Code § 59.1-200(A).  Mya Saray alleges that Al-Amir has violated Va. Code § 59.1-200(A)(1-3), (5), and (6) by misrepresenting goods as those of Mya Saray, misrepresenting the source of Al-Amir goods, misrepresenting that its goods are affiliated, connected, or associated with Mya Saray, misrepresenting to consumers that its goods have the characteristics and benefits of Mya Saray goods, and misrepresenting to consumers that its goods are similar to those of Mya Saray in terms of standards, quality, grade, style, or model.  Mya Saray also alleges that Al-Amir

22

has violated Va. Code § 59.1-200(A)(14) by using other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.  (Compl. at ¶ 51.)

The use of Mya Saray trademarks constituted an intentional misrepresentation designed to cause consumers to believe that Mya Saray was in some way responsible for the goods, causing damage to Mya Saray.  The undersigned therefore finds that Mya Saray has pled facts establishing the above as violations of Va. Code § 59.1-200(A)(1-3), (5), and (6).  In addition, the undersigned finds that Mya Saray has sustained damage as a result of the breaches of the VCPA (though it is indistinguishable from the damage resulting from violations of the Lanham Act).  Consequently, Mya Saray is entitled to attorneys' fees and court costs related to this claim.  Va. Code. § 59.1-204(B).

Paragraph (14) of Section 59.1-200(A), however, refers to "any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  Va. Code § 59.1-200(A)(14).  The phrase "any other" refers to conduct not expressly covered by other provisions of the statute.  All wrongful conduct alleged against Al-Amir is within the scope of the other code provisions, so the defendants have not violated the catch-all provision of Va. Code § 59.1-200(A)(14).

**D.   Count V – Breach of Contract**

23

In addition to the above statutory claims, Mya Saray alleges that Al-Amir and Mr. Hammoud breached the terms of the Settlement Agreement agreed by the parties in prior litigation. (Compl. at ¶¶ 52-55.) The undersigned finds that Mya Saray has established that Al-Amir and Mr. Hammoud failed to abide by the terms of the Settlement Agreement, causing actual damages recoverable under Virginia law.

### E. Count VI — Patent Infringement

Mya Saray alleges that Al-Amir and Mr. Hammoud infringed the '405 patent, owned by Mya Saray. (Compl. at ¶¶ 6, 58.) The construction of a patent claim is a matter of law, exclusively within the province of the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 377-90 (1996). The defendants have not filed an opposing Claim Construction brief, and Mya Saray's briefs are persuasive. (Docs. 17 & 19.) The undersigned concludes that Al-Amir and Mr. Hammoud have intentionally infringed Mya Saray's patent as described in Mya Saray's complaint. (Compl. at ¶¶ 56-59.) The undersigned also finds that Mya Saray has been damaged by the defendants' infringements and will continue to be damaged irreparably unless the infringing activity is enjoined. (Compl. at ¶ 60.)

As to attorneys' fees, the undersigned finds that an award of reasonable attorney's fees is appropriate. The scope of the defendants' misconduct in this case justifies a finding that this is an "exceptional" case within the meaning of 35 U.S.C. § 285. See Waner v. Ford Motor Co., 331 F.3d 851, 857 (Fed. Cir. 2003); Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1034 (Fed. Cir.

2002); <u>Hoffmann-La Roche Inc. v. Invamed Inc.</u>, 213 F.3d 1359, 1365 (Fed. Cir. 2000); <u>Sensonics, Inc. v. Aerosonic Corp.</u>, 81 F.3d 1566, 1574 (Fed. Cir. 1996). In addition, the undersigned finds that the defendants' wasting of Mya Saray's time and resources on bad-faith litigation justifies an award of prejudgment interest on attorney's fees. <u>Mathis v. Spears</u>, 857 F.2d 749, 760-61 (Fed. Cir. 1988).

## F. Damages

In its Statement of Damages (Doc. 130), Mya Saray provides a concise statement of the evidence related to damages, some of which had been submitted as part of its prior Motion for Sanctions. (Doc. 112.) In the preceding pages, the undersigned determined that the defendants are liable under each cause of action. This section will evaluate the plaintiff's claim for damages for each of the above claims.

The plaintiff is in an unenviable position. Because the defendants failed to produce, and seem to have destroyed, any evidence that would help Mya Saray establish damages calculations, Mya Saray asks for factual findings that would help substitute for complete and thorough discovery. Though the undersigned does not find that factual findings would be a particularly effective means of calculating damages, the available evidence warrants the calculations herein.

## 1. Infringement of '405 Patent

Patent damages include "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and

costs as fixed by the court." 35 U.S.C. § 284. The proper amount of damages will compensate the patent owner for pecuniary loss sustained because of the infringement. Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc., 26 F. Supp. 2d 834, 859 (E.D. Va. 1998)(quoting State Industries, Inc. v. Mor-Flo Industries, Inc., 883 F.2d 1573, 1577 (Fed. Cir. 1989)). For a patent owner to obtain lost profits as actual damages, there must be a demonstration that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales. Micro Chemical, Inc. v. Lextron, Inc., 318 F.3d 1119, 1122 (Fed. Cir. 2003). The undersigned is aware, however, that by definition, lost profits are hypothetical and therefore cannot be computed with precision. H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co., 536 F.2d 1115, 1122 (6th Cir. 1976).

One way[4] for a patentee to prove its entitlement to lost profits is to show: (1) demand for the patented product, (2)[the] absence of noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made. State Indus., 883 F.2d at 1577 (quoting Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152, 1156 (6th Cir. 1978)). If the patent owner and infringer sell essentially the same product, proof of a significant number of sales by the patent owner or the infringer is deemed compelling evidence of demand. See, e.g.,

---

[4] The two-supplier market test set forth in State Indus. v. Mor-Flo Indus., 883 F.2d 1573, 1577 (Fed. Cir. 1989) is inapplicable here because there is no evidence that Al-Amir was the only other supplier of the patented product.

Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1122 (Fed. Cir. 2003).

35 U.S.C. § 284 makes no specific mention of the evidentiary requirements for proof of damages from patent infringement, but the statute does provide that the court "may receive expert testimony as an aid to the determination of damages[.]" 35 U.S.C. § 284. The undersigned interprets this provision to mean that the court has discretion to determine whether a particular case warrants resort to an expert, or whether the facts before it provide reasonable certainty without expert testimony. The undersigned finds that no expert testimony is necessary here. Only Mya Saray has submitted evidence of economic damages that does not require expert analysis, and Mya Saray's evidence is sufficiently concrete that the undersigned may calculate damages with reasonable certainty.

In support of its claim for patent infringement damages, Mya Saray offers the testimony of its owner and president, Mahmoud Badawi. (Decl. of Mahmoud Badawi, Doc. 130-1.) The undersigned finds that his testimony meets the Panduit test outlined above.[5] There exists consistent demand in the relevant time periods for Mya Saray's patented QT hookah, both in Michigan and nationally. (Badawi Decl. at ¶¶ 11-13.) When Al-Amir began selling infringing "Andile Light" hookah, Mya Saray's sales dropped significantly. (Badawi Decl. at ¶ 12, Table 1.0.) The undersigned likewise concludes that there were no

---

[5] Obviously, the undersigned would have preferred to make these recommendations after the parties had conducted full and fair discovery. The defendants' conduct has made that goal an impossible one.

noninfringing substitutes for the patented QT hookah because the QT's patented design was the only noninfringing product containing the QT's particular set of design and functional elements. (Badawi Decl. at ¶ 9.)  Mya Saray would have been able to meet increased demand for the QT hookah in light of its flexible manufacturing methods. (Badawi Decl. at ¶¶ 9-10.)  Moreover, Mya Saray also has evidence of the profits on QT hookahs that would have been sold during Al-Amir's infringement, which it calculates at $33,473.88. (Badawi Decl. at ¶ 16.)  The undersigned finds these calculations sound and credible.

The next issue is whether the plaintiff should receive treble damages under 35 U.S.C. § 284.  To be eligible for treble damages, a plaintiff must show willful infringement of its patent.  i4i Ltd. Partnership v. Microsoft Corp., 598 F.3d 831, 858-59 (Fed. Cir. 2010). To prove willful infringement a plaintiff must prove by clear and convincing evidence that the defendant acted without a reasonable belief that its action was noninfringing.  Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1346 (Fed. Cir. 2001).

The evidence here is mixed.  A photograph taken by one of Mya Saray's investigators on June 16, 2009 displays the '405 patent on a MYA-branded cage at the World Smokers store. (Doc. 20-2 at 7.)  There is no evidence that the defendants ever attempted to ascertain whether their products infringed Mya Saray patents.  After suit was filed, the defendants destroyed all potentially infringing items, cutting off discovery at its roots, a move which indicates that they had been

28

caught red-handed.  On the other hand, the '405 patent was granted only in mid-2008, at the very beginning of the conduct alleged here. The Settlement Agreement resolving the parties' 2008 suit had made no provision for patent infringement.  The undersigned appreciates the fact that the defendants seem to operate with total disregard for the law.  (Doc. 20-2 at ¶ 19.)  In light of their conduct before the undersigned, it seems unlikely that they would have changed their behavior even if they had known of the '405 patent.  The undersigned nonetheless cannot infer from this record that the defendants knew about the '405 patent or acted with the requisite "wanton disregard of the patentee's rights."  Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992)(overruled on other grounds); Markman v. Westview Inst. Inc., 52 F.3d 967 (Fed. Cir. 1995).  The undersigned therefore concludes that the damage to Mya Saray from the infringement of the '405 patent should remain at $33,473.88.  (Badawi Decl. at ¶ 16.)

**2.    Unfair competition under the Lanham Act (MYA mark, MYA (Stylized) mark, and QT Hookah)**

Damages under the Lanham Act include "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  Where the defendants' infringement was intentional, the appropriate underlying damages are to be trebled.  15 U.S.C. § 1117(b).  Alternatively, the plaintiff may elect to recover an award of statutory damages instead of actual damages.  15 U.S.C. § 1117(c).  "The trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party."  Roulo v. Russ Berrie & Co., 886 F.2d 931, 941 (7th Cir. 1989).  In cases like this

one, where infringing activity has been subject to very little recordkeeping, the statutory damage provision allows the court, in its discretion, to provide an alternative remedy to actual damages.  The plaintiff has elected this remedy here.  (Doc. 130 at 16.)  The court has wide discretion to determine an appropriate award of statutory damages under the Lanham Act.  Larsen v. Terk Technologies Corp., 151 F.3d 140, 149-50 (4th Cir. 1998); see also Diane von Furstenberg Studio v. Snyder, No. 06-cv-1356, 2007 WL 2688184, at *5 (E.D. Va. Sept. 10, 2007).

For a willful use of a counterfeit mark, the defendant may be assessed statutory damages up to $2,000,000 per mark.  15 U.S.C. § 1117(c).  Infringement is willful if a defendant has knowledge that its conduct represented infringement or recklessly disregarded the possibility.  See Kepner-Tregoe, Inc. v. Vroom, 186 F.3d 283, 288 (2d Cir. 1999)(quoting Twin Peaks Prods., Inc. v. Publications, Int'l, Ltd., 996 F.2d 1366, 1382 (2d Cir. 1993)).  The defendants had actual knowledge that Mya Saray had trademarks enforceable under the Lanham Act, at the very latest, when Mya Saray filed its 2008 lawsuit.  The subsequent infringement was therefore willful.

A counterfeit mark may be defined as a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.  Rolex Watch USA, Inc. v. Meece, 158 F.3d 816, 826 (5th Cir. 1998) (reviewing 15 U.S.C. § 1116(b) and § 1127).  Even if the mark itself is authentic, its substitution into an otherwise counterfeit product does not redeem the use of the mark.  See id.  The defendants'

use of the MYA marks in some products constituted counterfeiting under 15 U.S.C. § 116(d)(1)(B) because it involved precise, almost exact copying of Mya Saray hookah components combined with authentic or forged Mya Word and Design marks.  (Compl. at ¶¶ 22, 25-27.)  Because the defendants' conduct constitutes willful counterfeiting, the undersigned may determine the appropriate amount of damages for the counterfeiting of each mark, though no assessment may exceed $2,000,000.  The plaintiff urges that the court adopt a "seven-figure" statutory damages award, namely, $1,500,000.  (Doc. 130 at 14-17.)

Two of the trademarks infringed here were the Mya Word and Design marks, both of which were used to mark non-Mya products.  (Doc. 130 at 17-20.)  The defendants used an authentic Mya Saray hookah component with the MYA Design mark in conjunction with inferior hookah components to create what the plaintiff calls the "Mutt" hookah. (Doc. 130 at 16.)  The defendants admitted to selling approximately 1000 of these hookahs.  (Doc. 112-2, ¶¶ 2, 7.)  The selling price of the so-called "Mutt Hookah" was $20, and therefore presumably brought in approximately $20,000 in revenue to the defendants.  (Doc. 20-2 at ¶ 20, 11.)

On other occasions[6], the defendants sold third-party hookah models, specifically the "Andile" hookah, as a Mya Saray hookah using the MYA Word mark.  (Doc. 20-2, ¶ 12.)  Invoices attached by Mya Saray to the First Motion for Sanctions (Doc. 113-1 at 19-21) show evidence

---

[6] Mya Saray states that the defendants offered other Mya-branded items, but does not indicate whether these were counterfeits.  (Doc. 20-2 at ¶ 20.)  The undersigned therefore does not address these hookahs.

that Al-Amir purchased 850 infringing "Empire" hookahs, which appear
to be identical to the infringing "Andile" hookah, from T.M.S.
International under item number 8168 subsequent to November 14, 2008,
the date of the Settlement Agreement.  For the purposes of determining
statutory damages, the undersigned will assume that these units sold
each at a retail price of $20, for total revenue of approximately
$17,000.  (Doc. 20-2 at 6.)

Due to the defendants' discovery misconduct, it is impossible to
determine how many counterfeits of Mya Saray's QT hookah have been
sold.  The plaintiff repeatedly states that the defendants admitted to
selling 4,390 counterfeit QT hookahs over five years, but it is
unclear how the plaintiff arrived at this figure.

Based on the refusal of the defendants to cooperate in
litigation, the undersigned is skeptical that they have either
responded completely to discovery or have accurately reported the
figures regarding sales of hookahs.  Instead of speculating about the
magnitude of difference between what Al-Amir and Mr. Hammoud have
admitted and what they actually sold, the undersigned determines that
statutory damages of $120,000 should adequately compensate Mya Saray
for its lost profits.  Any amount in excess of the actual lost profits
is intended to accommodate (1) the margin of error caused by the
defendants' discovery misconduct; (2) the defendants' profits from
sale of lower-quality goods at prices comparable to Mya products; (3)
the need to deter the defendants from further counterfeiting and

trademark infringement; and (4) the outrageous severity of the defendants' spoliation during litigation.

### 3.    Breach of contract

Under Virginia law, a plaintiff suing for breach of contract is limited to recovering actual damages caused by the breach.  See Haass & Broyles Excavators, Inc. v. Ramey Bros. Excavating Co., Inc., 355 S.E.2d 312, 315 (Va. 1987)(citing Manss-Owens Co. v. Owens & Son, 105 S.E. 543, 549 (Va. 1921)).  Damages resulting from violations of the Lanham Act or other laws that also breach the Settlement Agreement are enumerated in the preceding sections, and are not addressed here, lest they allow a double recovery.

In violation of the November 2008 Settlement Agreement, Al-Amir purchased 2,090 infringing Andile Light hookahs through Kassir Co. as "Hookah Jamila Cage" for an average price of $8.28.  (Doc. 113-1, Exhibit 3.)  These items sold at retail for $25.00 each.  (Doc. 20-2 at 16.)  Mya Saray's actual damages from the sales of the Andile Light amount to $34,944.80.

Mya Saray also provides evidence that the defendants purchased infringing Maganda hookahs before the November 14, 2008 Settlement Agreement.  (Doc. 113 at 19.)  Mya Saray asks the undersigned to infer that the Maganda hookahs purchased 10 and 11 months before the Agreement was signed were still in stock and sold in or after November 2008.  (Doc. 113 at 20.)  Because the defendants destroyed the infringing hookahs after suit was filed, it is not at all clear to the undersigned that there is any evidence to support this inference.

Reviewing prior months' purchases of Maganda hookahs, and applying the assumption that Al-Amir ordered new Maganda hookahs when the inventory was low, it appears to the undersigned that Al-Amir would have sold out of its supply of Maganda hookahs well before the November 14, 2008 settlement date.  Consequently, the undersigned declines to incorporate the Maganda hookah into the damages determination.  The actual damages resulting from the breach remain at $34,944.80.

### G. Injunctive Relief

The trial court has authority to enter injunctions against unfair competition.  15 U.S.C. § 1116.  In this case, it is clear that money damages are inadequate to compensate Mya Saray for the continuing harm likely to result from the defendants' scofflaw attitudes toward this Court and federal law generally.  Any damages resulting from these breaches are likely to be inadequate, and the defendants are unlikely to cooperate with any future suits for damages.  Therefore the undersigned finds that an injunction is the best means to prevent the defendants from future infringement.

### H. Attorney's Fees and Costs

The undersigned had noted in prior discovery orders that plaintiff would be awarded attorney's fees and costs incurred in connection with those motions, but no specific award had yet been granted.  Subsequently, plaintiff submitted Plaintiff's Statement of Fees and Costs in Association with Plaintiff's Statement of Damages, Ct. Doc. No. 130 (Doc. 134).  The undersigned has reviewed that submission as well as the Declaration of Attorney Gorham S. Clark,

Esquire (Doc. 136), which supports plaintiff's claim for fees and costs as well and defendants' objections thereto (Doc 133).

The Court must evaluate the claim for fees pursuant to the "Johnson Factors" as reiterated in Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 234-44 (4th Cir. 2009).  An analysis of those factors follows.

### 1. Time and Labor Expended

Plaintiff's counsel's time on this case might be seen as high, given that no trial has been held.  However, as set forth previously in this report, the vast majority of the motions filed by plaintiff have been caused by defendants' own obstructionist behavior. Additional normally unnecessary time was required because of defendants' attempts to evade service of process and counsel's efforts to quantify damages without any meaningful discovery responses from defendants.  The summary of fees by litigation category as set forth at Paragraph 27 in the Declaration of M. Keith Blankenship in Support of this Statement of Fees and Costs (Doc.134) demonstrates that approximately 40 percent of counsel's time was spent on those issues. Thus, the undersigned recommends that the time and labor expended by plaintiff's counsel be approved as reasonable and necessary.

### 2. Novelty and Difficulty of the Questions Raised, 3. Skill Required to Properly Perform the Legal Services Rendered, 4. The Attorney's Opportunity Costs in Pressing the Instant Litigation, 6. The Attorney's Expectation at the Outset of the Litigation, 7. The Time Limitations Imposed by the Client or Circumstances, 10. The Undesirability of the Case Within the Legal Community in which the Suit Arose, 11. The Nature and Length of the Professional Relationship Between Attorney

**and Client, and 12. Attorneys' Fees and Awards in Similar Cases.**

The Court finds that those factors are not significant enough to alter the requested reward either higher or lower.

**5.    The Customary Fee for Like Work**

The Court finds that it is appropriate to consider the declaration submitted by Gorham S. Clark, Esquire, who is not counsel of record in this case, to determine the customary fee for like work in Northern Virginia.  Based on the qualifications and experience of all plaintiff's counsel, the evidence presented, and the experience of the undersigned, it is recommended that the following hourly rates be found reasonable and customary for Northern Virginia:

| | |
|---|---|
| John F. Frasier III | $375.00 |
| William T. Welch | $365.00 |
| Christian Adams | $375.00-$385.00 |
| James A. Allen | $385.00 |
| M. Keith Blankenship | $365.00 |
| Susan M. Simpson | $250.00 |
| Alicia M. Schmuhl | $175.00-$185.00 |
| Kate Briggs | $135.00 |

Additionally, the total costs incurred of $3,562.12 are reasonable and necessary.

**9.    The Experience, Reputation and Ability of the Attorney**

The undersigned finds that plaintiff's counsel's experience, ability and reputation support the hours claimed as

well as the hourly rates set forth above.  Therefore the
undersigned recommends that attorney fees in the amount of
$248,863.29, reflecting the $40,000.00 discount given to
plaintiff, plus costs in the amount of $3,562.97 be awarded to
plaintiff.

IV. <u>RECOMMENDATION</u>

The undersigned recommends that default judgment be entered
against Defendants Ali Hammoud and Al-Amir, Inc.  The Court should
award Mya Saray $188,418.68 in damages, plus costs in the amount of
$3,562.97 and attorney's fees in the amount of $248,863.29 in
accordance with 15 U.S.C. § 1117(b), 35 U.S.C. § 285, and Va. Code. §
59.1-204(B).

Because legal relief is inadequate, the Court should enter a
permanent injunction against the defendants, enjoining them from:

- Further breaches of the Settlement Agreement;

- Further infringement of Mya Saray's trademarks Reg. Nos.
  3,031,439 & 3,031,440, and Mya Saray's patent, United States
  Patent No. 7,404,405;

- Engaging in further unfair competition with Mya Saray's
  products, namely, using the designations Mya and Mya (as
  stylized) and hookah products and packaging that have a design
  confusingly similar to any protectable Mya Saray trade dress,
  namely, what the defendants market as the Andile hookah or
  Maganda hookah, or the Mya Saray QT hookah;

- Selling the Jamila hookah or Andile Light hookah without an appropriately legible reference to its non-Mya Saray name or its non-Mya Saray source; or

- Moving to the retail level any units whose sale or possession are prohibited by this injunction, whether in the defendants' possession, or held by wholesalers, jobbers, or other industry middlemen.

The Court should further order the defendants to make available for pickup by Mya Saray within five (5) days all products:

- Created or produced by Mya Saray; or

- Infringing any of Mya Saray's trademarks or patents.[7]

V.   <u>NOTICE</u>

The parties are advised that exceptions to this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of its service.  A failure to object to this Report and Recommendation waives appellate review of any judgment based on it.

The Clerk is directed to send a copy of this Report and Recommendation to all counsel of record.  The Clerk is further directed to send a copy of this Report and Recommendation to the defendants at the following addresses:

---

[7] Plaintiff also submitted an Emergency Supplement to Mya Saray's Statement of Damages (Doc. 135).  The undersigned finds that this is further evidence of Defendants' unlawful conduct and an additional basis for the award of the totality of plaintiff's counsel fees and costs.  This does not, however, change the above recommendations.

Mr. Ali Hammoud
27120 Kingswood Dr.
Dearborn Heights, MI 48127

Al-Amir, Inc.
15322 West Warren Ave.
Dearborn, Michigan 48126


                                       /s/
                         THERESA CARROLL BUCHANAN
                         UNITED STATES MAGISTRATE JUDGE

October 18, 2011
Alexandria, Virginia